## No. 2497
## Second Circuit

---

### D. J. SCOTT v. E. J. DEAS COMPANY, INC.

(November 7, 1925, Opinion and Decree)
(February 8, 1926, Rehearing Refused)

---

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Master and Servant —Par. 160 (a).**

Where the injured employee, suing under the Workmen's Compensation Act No. 20 of 1914, took all the treatment suggested by the physician attending him, but refused to undergo additional treatment in which he was to be placed in a jacket or plaster of paris cast and take treatment from three to twelve months, which was the treatment offered by the defendant's physician, refusal to take this additional treatment was not so unreasonable as to deprive him of compensation under the Act.

### ON A REHEARING

2. **Louisiana Digest—Master and Servant —Par. 160 (a).**

In a Workmen's Compensation case under Act No. 20 of 1914, where the treatment offered to the injured employee by the defendant would place the injured employee in a state of immobility for a period of at least twelve months with no guarantee that he would be benefited thereby, the refusal of the injured employee to accept this treatment is not unreasonable and, therefore, will not debar him from recovery under the Workmen's Compensation Act.

3. **Louisiana Digest—Master and Servant —Par. 160 (d).**

Section 8, Subsection 5, of the Workmen's Compensation Act No. 20 of 1914, as amended by Act 216 of 1924, requires the employer to furnish medical or surgical aid to the amount of $250.00, but this does not require the injured employee to accept it.

Appeal from First Judicial District Court of Louisiana, Parish of Caddo. Hon. J. H. Stephens, Judge.

This is a suit brought by an injured employee for compensation under the Workmen's Compensation Act No. 20 of 1914.

Judgment for plaintiff and defendant appealed.

Judgment affirmed.

Long & Crow, of Shreveport, attorneys for plaintiff, appellee.

Wilkinson, Lewis & Wilkinson, of Shreveport, attorneys for defendant, appellant.

### STATEMENT OF THE CASE

REYNOLDS, J.  This is a suit under the Workmen's Compensation Act of Louisiana for compensation at the rate of $15.60 per week during disability not exceeding 400 weeks for an injury received by plaintiff in the small of the back and left hip claimed to have produced permanent total disability.

Defendant denied liability, and during the course of the trial counsel for defendant tendered to plaintiff medical or surgical treatment by which he should be placed in a jacket or plaster of paris cast and take treatment from three to twelve months, offering to pay the medical bill and compensation during disability.

On these issues the case was tried and there was judgment for plaintiff and defendants appealed.

### OPINION

In the brief of defendants the only defense stressed is that plaintiff refused to take the medical or surgical treatment suggested by which he might be restored to permanent health.  It is contended that

his refusal to take such treatment is so unreasonable as to debar him from compensation during the period of his refusal.

The surgeons sworn as witnesses in the case agree that the treatment suggested by Doctor Thomas Ragan and tendered to plaintiff would be beneficial and without danger to his life or health, but none of the doctors could say with certainty that such treatment would result in a cure.

Doctor Ragan testified (Evidence, page 37):

"Q. Now, doctor, what have you to say with reference to the treatment or permanency of that condition, and as to how long it will take to cure it?
"A. Well, if that had been properly mobilized at first, I think that he would have been perfectly well and free from pain without deformity; in other words, the new position would have been firmly fixed and painless in six months. He would have no more trouble and (be) just as he was before.
"Q. At this time, what are the probabilities and possibilities of the plaintiff receiving treatment and recovering?
"A. Well, if he still has pain, I think it ought to be mobilized even yet, either having a satisfactory jacket or a plaster put on him, including both hips and that part of the spine, and he would get well.
"Q. Now if that was done, doctor, properly, how long do you think it would take this man to get all right?
"A. Well, I think he would have—it would possibly have to be removed a time or two—but in three or four months time I do not think he would have any great pain.
"Q. Now, doctor, if that treatment was given, and this plaintiff took that treatment, how long do you think it would be until he would be able to do hard manual labor again?
"A. Well, he would have a stiff back to a certain extent. There would be a mobility in certain movements, but he could get along pretty well.

### (Page 51)

"Q. Would you guarantee, doctor, that if this man would follow your instructions, and take all the precaution that you give him and say that he will be just in as normal a condition after you have treated him for a year as he was the day before the accident occurred?
"A. I certainly would not give a guarantee of that kind.
"Q. Then it is all problematical with you, more or less, when you say that you can cure him?
"A. Well, the reasoning leads to certain conclusions.

### (Page 52)

"Q. Now, doctor, in all seriousness, you don't think that this man with any kind of treatment will ever be in his normal condition, that he was before the accident occurred?
"A. Well, we do not think that that vertebrae will get back, but it will adjust itself, and, in fact, a man may be flatfooted and after a while it will get to where it don't hurt him to walk, and by use it will ultimately become where it won't pain him any more.

### (Page 53)

"Q. Doctor, you really, then, in your opinion—going back again—you think that in a year that the man would have no defect?
"A. Well, I would not guarantee it, but at the same time I believe that the man would be well within a year, but I would not guarantee it.

### (Page 55)

"Q. Doctor, would you advise putting this man in a plaster of paris cast?
"A. I think I would try it. I am not a dogmatic about that, but I think it would be helpful, and it would be all right to try it.
"Q. Now would it not be very questionable with that method—I mean by the results probable and rather doubtful, since that injury occurred on the 13th of January and this is the 28th day of April, and no steps like that taken at an earlier date?
"A. I think something has been lost in not having it tried at an earlier date, but I think I would try it—I think with immobility he would not suffer pain when you get a stable condition, and I would try it.
"Q. Now this is about the most that you could promise about that?
"A. Well, I do not know anything better to do just now."

Doctor C. H. Cassity testified (Evidence, page 16):

"Q. Doctor, what do you think about the permanency of this condition such as you find, and such that is disclosed by the X-ray examination?

"A. My judgment is that the adjustment of the sacro iliac joint would probably require from eighteen months to two years to get well, if it gets well at all. I believe that the proper treatment would be to definitely locate where that injury is caused, and it is somewhat out of line and dislocated, which has not been reduced, and get it in its proper position and hold it there and we would get a recovery; where there is a fracture and it is placed back in position and held in position where they are not redislocated we get very good results, and I think that this stretching or injury here to the sacro iliac joint, that he should be put in a plaster of paris cast, and we might expect a cure in from about four to six months' time; often a man walks around who is injured, and it is hard to get good results by those bones sliding against each other and producing inflammation, and adds to this dislocation and separation, and it inflames the joint and the bone surface there.

"Q. Well, doctor, what about the tilting of the vertebrae and as to the remedy for that?

"A. Well, I doubt now there is a remedy for it.

(Page 33)

"Q. Now, doctor, from the X-ray examination and the fusion of the transverse process, of the fifth lumbar with the sacrum on the right, do you think there could be a normal adjustment made there of that fusion of the transverse process?

"A. There could not be without a major operation, as the surgeon would have to go in there and chisel that loose.

"Q. Well, doctor, what per cent of mortality do you think this would be with an operation of that kind?

"A. What per cent?

"Q. Yes, what per cent of fatalities do you think there would be in operations of that kind going around the spinal column there?

"A. Well, the per cent of death rate in operations of that character in and around the cord in a great many cases it is not so high, but whether the man would get one hundred per cent function is a serious question. You know that operations are not always successful.

"Q. Doctor, with this fusion of the transverse process of the fifth lumbar with the sacrum on the right, what would likely be the permanency or not of that condition?

"A. Well, that will in all possibility be absolutely permanent.

"Q. Now what effect would you say that would have upon his ability to move and handle objects?

"A. Well, that would decrease the movability of the lower end of the spine and interfere with the free movement forwards, sideways or backwards.

"Q. Now, doctor, assuming that this man got his lick as explained to you a while ago—and has not done any work since—this was January 13, in January of this year, and that he has lost fifteen or twenty pounds in weight, what do you think of the probable outcome of his condition, his injury?

"A. Well, as regards the fusion of those two bones, I think that this is a permanent injury, and as regards the sacro iliac separation, as I stated before, the permanency of that depends upon whether or not he was given proper treatment at the beginning; in other words, if put in a plaster of paris cast for as much as two months' time, and still there is a separation there, then I would say he is permanently injured. If he had no such treatment as I have been talking about and the sacro iliac joint is separated, I would say that the time for giving rational treatment is pretty well past."

From this evidence it is clear that the doctors who testified in this case disagree as to the extent of the plaintiff's injury. Doctor Cassity holds that to correct the injury would require a major operation; that the surgeon would have to get in there and chisel that loose. Doctor Ragan and Doctor Crain think plaintiff's condition congenital and in no way caused by the accident. Under any condition the plaintiff, in order to receive the benefit of the treatment tendered by defendants, would have to undergo a serious treatment by which he would have to remain in a jacket

or plaster of paris cast for from three to twelve months and that at best the treatment would be an experiment.

Plaintiff, as soon as he was hurt—January 13, 1925—was placed under the treatment of Doctor Williams, physician for the defendant, and took all the treatment suggested by him. We do not think plaintiff's refusal to undergo the additional treatment tendered him was so unreasonable as to deprive him of the compensation he is entitled to under the evidence adduced on the trial.

Under the authority of Reeves vs. Dietz, et al., 1 La. App. 501.

For these reasons the judgment of the lower court is affirmed.

---

ON APPLICATION FOR REHEARING

ODOM, J. It is not disproved that the plaintiff in this case is totally, permanently disabled; but defendant proffered certain medical treatment to plaintiff which he refused, and defendant contends that it should not be required to pay compensation unless the treatment which is offered at its own expense fails to relieve the disability.

In the course of our former opinion we said:

"The surgeons sworn as witnesses in the case agree that the treatment suggested by Doctor Thomas Ragan and tendered to plaintiff would be beneficial and without danger to his life or health, but none of the doctors could say with certainty that such treatment would result in a cure."

Counsel for defendant construe that to mean that we hold that the refusal of plaintiff to accept the treatment was unreasonable in view of the fact that physicians could not guarantee a cure.

We do not mean to so hold. Of course, physicians will not guarantee a cure in any case. A reading of the decision will disclose that we did not base our holding on the ground, altogether that a cure was not guaranteed, for we said:

"Under any condition, the plaintiff, in order to receive the benefit of the treatment tendered by defendant, would have to undergo a serious treatment by which he would have to remain in a jacket or plaster of paris cast for from three to twelve months and that at best the treatment would be an experiment."

The treatment suggested by defendant's physicians was to place the body in a plaster cast where it would have to remain for quite a long time.

Doctor Thomas Ragan, the physician who was selected by defendant to administer the treatment, said that while he would not guarantee a cure, yet

"I believe that the man would be well within a year."

And he was asked:

"Doctor, would you advise putting this man in a plaster of paris cast?"

And he said:

"I think I would try it. I am not a dogmatic about that, but I think it would be helpful, and it would be all right to try it."

And he again says:

"I think something has been lost in not having tried it at an earlier date, but I think I would try it—I think with immobility he would not suffer pain when you got a stable condition, and I would try it."

And he was asked:

"Now, that is about the most that you could promise about that?"

And he said:

"Well, I do not know anything better to do just now."

We fail to find in Doctor Ragan's testimony that he holds out more than a slight

ray of hope to plaintiff as a result of the treatment which he offers. In the final analysis he does not even venture an opinion that it will result beneficially. He says, in fact, that the treatment would do no harm, and he would try it, for he knows of nothing else to suggest. Doctor Ragan is the physician selected by defendant to administer the treatment.

Therefore, plaintiff. is confronted with the prospect of having his body lying in a state of immobility for a period of at least twelve months, according to this physician, with little trouble of being benefited.

Doctor A. P. Crain, another physician, said:

"I feel reasonably sure, without being positive, that the man would be materially benefited, if not cured."

And it would take from six to twelve months.

In view of the fact that plaintiff would be subject to great inconvenience and, we feel reasonably sure, discomfort by the treatment, we cannot say that his refusal to accept it is unreasonable, especially in view of the fact that the physicians hold out so little hope of recovery.

It must be borne in mind that our statute provides that in case of injury the employee is entitled to compensation and does not make the payment thereof dependent upon the acceptance by the plaintiff of an operation or medical treatment proffered by the defendant. The statute requires the employer to furnish medical or surgical aid to the amount of $250.00, but it does not require the injured employee to accept it.

However, if continued disability is caused by the unreasonable refusal to accept medical or surgical aid when unaccompanied by danger to life or health or physical discomfort or great inconvenience, it may well be said that he should forego compensation.

But in this case, where the employee would be subjected to discomfort and great inconvenience of having his. body incased for a period of from six months to one year and of having to remain immobile all that time and with but slight hope held out for improvement or recovery, we cannot say that his refusal is unreasonable.

Every phase of cases of this kind has been discussed by the courts in this country and in England. It is needless to cite the cases here, but see: Bronson vs. Harris Ice Cream Co., 150 La. 455, 90 South. 759, and the authorities there cited.

Rehearing refused.